2000 SD 13

**AUTO–OWNERS INSURANCE COMPANY, Plaintiff and Appellant,**

v.

**HANSEN HOUSING, INC., Defendant and Appellee.**

**No. 20745.**

Supreme Court of South Dakota.

Considered on Briefs Sept. 13, 1999.

Decided Jan. 26, 2000.

506

Roy A. Wise of Richardson, Groseclose, Wyly, Wise & Sauck, Aberdeen, South Dakota, Attorneys for plaintiff and appellant.

Lonald L. Gellhaus of Gellhaus, Gerdes & Gellhaus, Aberdeen, South Dakota, Attorneys for defendant and appellee.

KONENKAMP, Justice.

[¶ 1.] Auto-Owners Insurance Company appeals a declaratory ruling that its "Businessowners Policy" covered damages to a vacant commercial building owned by Hansen Housing, Inc. We uphold coverage for most but not all the claimed losses. Affirmed in part and reversed in part.

### Facts

[¶ 2.] Hansen Housing purchased the former Ipswich Community Hospital and adjacent properties at public auction in November 1989. Included in the $74,000 purchase were all the contents of the hospital, except the x-ray machine and the beds. Mike and Nancy Hansen, the principals of Hansen Housing, intended to convert the hospital into an apartment for the elderly.

[¶ 3.] To secure insurance coverage for the building, Mike Hansen contacted independent insurance agent Robert Johnston who had an agency contract with Auto–Owners Insurance Company. Hansen first sought a policy to cover only the purchase amount, but after Auto–Owners inspected the property and visited with underwriters, it determined that the building should be insured for $1.6 million through co-insurance.[1] Auto Owners issued a "Businessowners Policy" with an initial coverage period of July 9, 1990 to July 9, 1991. The policy was renewed for another year on July 9, 1991, and the coverage on the building was increased to $1.7 million. As of November 1991, Hansen Housing had yet to transform the former hospital into apartments. For a short time, Mike Hansen's sister operated a day care in the building, but that ended sometime in October, 1991.

[¶ 4.] A boiler system provided the building's main heat source, with auxiliary electric heating. As the building was providing no income, to avoid the $900 monthly cost of running the boilers, Hansen planned to winterize the structure and maintain the temperature at 45 to 50 degrees using electric heat. To help transfer the heat throughout the building, the boiler system's circulating pumps were kept operating.

[¶ 5.] In a further effort to save expenses, Mike Hansen met with agent Johnston on November 4, 1991, to discuss substituting the "Businessowners Policy" for less expensive coverage. Johnston died before this suit was brought; so, aside from Johnston's follow-up note to Hansen, we have only Hansen's rendition of what was discussed during their meeting. According to Hansen, Johnston could not immediately suggest a policy to fit Hansen's requirements, but Johnston said he would find a policy for Hansen to review. Hansen testified that Johnston told him a new policy could not be placed in effect until the "Businessowners Policy" was cancelled. Hansen signed a cancellation form. He testified that it was his understanding with Johnston that the policy would not be cancelled until a new one replaced it. As he recalled, the form "was not all filled out." On the top part of the cancellation form, however, the date and time of "11–4–91—4 P.M." was handwritten in the box labeled "Effective Date/Hour of Cancellation." Hansen testified that he stressed to Johnston that it was important that no lapse in coverage occur

---

1. The underwriter represented that co-insurance could provide coverage of $1.6 million for approximately the same cost as $65,000 of coverage without co-insurance.

because that would jeopardize compliance with FHA requirements. Johnston wrote a note to Hansen on November 5, 1991 stating:

> Nancy and Mike – we are going to need permission from the home office on this one – going from $1,750,000 to $60,000 made Pat Miller, underwriter, a little nervous. I will keep it insured as is until I hear back from the home office – Thanks, Bob.

Auto–Owners later issued a "Cancellation Invoice" dated January 7, 1992, declaring the "Businessowners Policy" to be "cancelled as of 11–05–91." Auto–Owners issued its "Tailored Protection Policy," with an effective period of November 5, 1991 to November 5, 1992.

[¶ 6.] On the very night after the meeting between Hansen and Johnston, at approximately 8:20 p.m., November 4, 1991, the damage occurred that gave rise to this suit. As the building had yet to be winterized, cold temperatures above the ceiling caused the sprinkler system pipes to freeze and break. The fire suppressant alarm activated, electronically summoning emergency services. When they arrived, fire department officers shut off the main water valve and, for safety reasons, had the utility company switch off the electricity to the building. Emergency personnel noticed that the penthouse door leading to the roof was open. It was later reported to the Edmunds County Sheriff's Department that the building had been broken into. Items were later reported missing.

[¶ 7.] A claims adjuster examined the damages and began negotiations with Hansen Housing. After negotiations failed, Hansen Housing submitted a water damage claim to Auto–Owners on April 19, 1993. A theft loss claim was submitted on April 21. On May 10, Auto–Owners rejected both claims because: (1) the policy on which the claims were made had been canceled just before the loss; (2) there were inaccuracies in the amounts claimed and some items said to be damaged were not covered under the policy; (3) the actual cash value of the property at the time of the loss was not stated; and (4) Michael Hansen signed the form but did not indicate his relationship to the named insured. Auto–Owners included new proof of loss forms with the rejection, and these were returned by Hansen Housing on April 21, 1994.

[¶ 8.] Auto–Owners brought a declaratory action seeking a ruling that it "is under no duty or obligation to provide coverage to [Hansen Housing] arising out of the loss sustained on or after November 4, 1991." The circuit court first decided that the "Businessowners Policy" was in force on the evening of November 4, 1991. Then the court ruled that the claimed losses were not excluded under the provisions of that policy. Auto–Owners now appeals asserting that (1) Hansen Housing cancelled the "Businessowners Policy" and thus it was not in force at the time of the loss; (2) any coverage is limited to Hansen Housing's financial interest in the property, which is the purchase price; (3) the frozen pipe loss is excluded because Hansen Housing failed to maintain heat in the building; (4) Auto–Owners is not obligated to pay for loss or damage caused by acts or decisions taken by those who responded to the emergency alarm; (5) the claims are barred because Hansen Housing failed to submit proofs of loss within the required time; (6) Hansen Housing is precluded from recovery because its agent intentionally concealed or misrepresented material facts about the water damage and theft claims; (7) the theft claim should be barred because Hansen Housing failed to give Auto–Owners prompt notice; and (8) the claimed frozen pipe and theft losses are barred because Hansen Housing failed to comply with the express terms of the policy in the event of loss or damage to the covered property.

### Standard of Review

[¶ 9.] We review declaratory judgments as we would any other order, judgment, or decree. SDCL 21–24–13; *Mid–Century Ins. v. Lyon*, 1997 SD 50 ¶ 4,

562 N.W.2d 888, 890; *Schull Constr. Co. v. Koenig,* 80 S.D. 224, 228–29, 121 N.W.2d 559, 561–62 (1963). A trial court's findings of fact are examined under the clearly erroneous standard. *Muhlenkort v. Union County Land Trust,* 530 N.W.2d 658, 660 (S.D.1995). These findings remain inviolate unless we are "firmly and definitely convinced a mistake has been made." *Wood v. South Dakota Cement Plant,* 1999 SD 8, ¶ 9, 588 N.W.2d 227, 229 (citation omitted).

■■■ [¶ 10.] Insurance contract interpretation, as well as statutory construction, are questions of law, reviewable de novo, with no deference given to the trial court's legal conclusions. *National Farmers Union Property and Cas. Co. v. Universal Underwriters Ins. Co.,* 534 N.W.2d 63, 64 (S.D.1995); *State Farm Mut. Auto. Ins. Co. v. Vostad,* 520 N.W.2d 273, 275 (S.D.1994). When an insurer invokes a contract exclusion to disallow coverage, "the insurer has the burden of proving that the exclusion applies." *American Family Mut. Ins. Co. v. Purdy,* 483 N.W.2d 197, 199 (S.D.1992) (citation omitted). If the terms of an insurance contract are susceptible to different interpretations, we adopt the interpretation most favorable to the insured. *Chord v. Reynolds,* 1999 SD 1, ¶ 14, 587 N.W.2d 729, 732 (citing *Olson v. United States Fidelity and Guar. Co.,* 1996 SD 66, ¶ 6, 549 N.W.2d 199, 200).

### Analysis and Decision

### 1. Policy Cancellation—Parol Evidence

■■■ [¶ 11.] Auto–Owners contends that Hansen Housing cancelled the "Businessowners Policy" on the afternoon before the loss: "Because of the Cancellation, Hansen was without insurance coverage from 4:00 p.m. on November 4, 1991, to 12:01 a.m. on November 5, 1991." The trial court ruled that Hansen's cancellation of November 4 "was never accepted by the ... company. Instead, they issued their written cancellation invoice which stated that the policy was canceled as of November 5, 1991." Auto–Owners directs our attention to its policy language: "The ... Insured ... may cancel this policy by mailing or delivering to us advance written notice of cancellation." This provision allows unilateral cancellation of the policy. No action was required by Auto–Owners to accomplish the cancellation: "the policy is effectively cancelled as of the date requested...." *Coppola v. Ins. Placement Facility,* 386 Pa.Super. 413, 563 A.2d 134, 138 (1989) (emphasis and citations omitted).

■■■ [¶ 12.] By the terms of the policy language, the insurer's acceptance was not required. Nonetheless, a notice must be unconditional to effect cancellation. *McQuarrie v. Waseca Mut. Ins. Co.,* 337 N.W.2d 685, 687 (Minn.1983). "[A]n insurance contract can only be cancelled pursuant to its terms or by mutual consent or agreement accompanied by unequivocal notice of cancellation from the insured to the insurer." *Milbank Mut. Ins. Co. v. State Farm Fire and Cas. Co.,* 294 N.W.2d 426, 430 (S.D.1980). "A request for cancellation of a policy must be unequivocal and absolute." 6A Appleman, Insurance Law and Practice § 4226, at 652 (Rev ed 1972); *see also* 45 CJS Insurance § 513 (1993); 17 Couch on Insurance 2d § 67:144, at 603 (Rev ed 1983); *Yant v. Bowker,* 248 Ark. 826, 454 S.W.2d 84, 86 (1970). The question is, did Hansen Housing express a present intent to cancel the policy when the form was signed in Johnston's office? If the cancellation request was executed on the condition that the policy would remain in effect until Johnston was able to find a substitute policy, and the cancellation would be effective only if such a policy was found, then there was no present intent to cancel the "Businessowners Policy."

■■■ [¶ 13.] At this point, the parol evidence rule presents itself. Johnston's handwritten note to Mike Hansen was offered as proof that Johnston understood the cancellation request was conditioned on finding a substitute policy. The trial

court relied on this note in making its decision. Was the note admissible to attack the clear import of the cancellation form? Ordinarily, when a document is unambiguous, its meaning must be found within its "four corners." *Spring Brook Acres Water Users Ass'n, Inc. v. George,* 505 N.W.2d 778, 780 n.2 (SD 1993). A written contract supersedes preceding or accompanying oral negotiations. SDCL 53–8–5.[2]

[¶ 14.] It must be understood that the parol evidence rule "is in no sense a rule of evidence, but a rule of substantive law." 9 J. Wigmore, Evidence § 2400, at 4 (Chadbourn rev ed 1981); Farmers State Bank v. Keiser, 83 S.D. 354, 159 N.W.2d 388, 390 (S.D.1968) (citations omitted). Nor is the rule limited to "parol," that is "oral," negotiations. E. Allan Farnsworth, Contracts § 7.2, at 466 (2d ed 1990). It can apply to prior contracts, written or oral, as well as prior negotiations. *Id.* Because the rule presupposes a valid agreement, it will not prohibit evidence showing that there was no agreement or no enforceable agreement. *Id.* § 7.4, at 480. "If the parol evidence rule rests on the rationale that a later written agreement has supplanted prior negotiations, it follows that the rule does not come into play until the existence of an enforceable written agreement has been shown." *Id.*

[¶ 15.] Intrinsic to finding the existence of an agreement is finding the intention of the parties. *Hisgen v. Hisgen,* 1996 SD 122, ¶ 4, 554 N.W.2d 494, 496. Thus, we must ask, did the parties intend their written contract to be the final expression of their actual agreement? "[A] writing cannot of itself prove its own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties." Restatement (Second) of Contracts § 210, cmt b (1981). A classic example of when the parol evidence rule will not prohibit an oral explanation for a writing is when a contract is conditionally delivered. Evidence may be offered, not to vary the terms of the contract, but to show that it was never delivered or was delivered to take effect only on the occurrence of some condition. *Saltzman v. Barson,* 239 N.Y. 332, 146 N.E. 618, 619 (1925); 3 Corbin on Contracts § 589, at 530 *et seq.* (1960); 4 Williston on Contracts § 634, at 1021 (3d ed 1961); *Branstetter v. Cox,* 209 Kan. 332, 496 P.2d 1345, 1347 (1972) (oral understanding that house sale contract was to be effective only on buyer's husband's approval).

[¶ 16.] Johnston's note was admissible to show that the parties had no intent to cancel coverage immediately. Cancellation was to take effect only on the occurrence of another condition. Hansen Housing delivered the cancellation form conditioned on the timely substitution of a new policy. We think it significant, also, that Auto–Owners' "Cancellation Invoice" appears to confirm the understanding in Johnston's note to hold the "Businessowners Policy" in effect until a new policy could take its place. The invoice declared that the policy was "cancelled as of 11–05–91," the day after the cancellation notice, the day the new policy took effect.

[¶ 17.] As cancellation is an affirmative defense, Auto–Owners had the burden of proving it. *American States Ins. Co. v. Southern Guar. Ins. Co.,* 53 Ark. App. 84, 919 S.W.2d 221, 222–23 (1996). We conclude that there was no unequivocal notice of immediate cancellation. Therefore, the trial court correctly decided that the "Businessowners Policy" was in effect at the time of the loss.

## 2. Coverage Limit—Financial Interest

[¶ 18.] The "Businessowners Policy" provided that, in case of a covered loss,

---

2. SDCL 53–8–5 provides: "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

Auto–Owners "will not pay you more than your financial interest in the Covered Property." The trial court determined that Hansen Housing should not be limited in its recovery to the amount it paid for the building. The court was skeptical of the idea that Auto–Owners insured the building for over $1.7 million, yet wanted to limit recovery to the auction price for the hospital building and its contents, effectively $60,000.

[¶ 19.] Auto–Owners contends that the purchase price is the fair market value and is therefore the measure of Hansen Housing's financial interest in the property. Hansen Housing argues that Auto–Owners accepted premiums based on $1.7 million in coverage, and to limit recovery to the purchase price would result in a windfall to the insurer. *See* Robert E. Keeton and Alan I. Widiss, Insurance Law § 3.6(b), at 194–95 (1988) (discussing the " 'unearned' premium question").

[¶ 20.] The rights and responsibilities of the parties are determined by the terms of the policy. The policy plainly provides that recovery is limited to the insured's financial interest in the property. Although SDCL 58–10–10 provides that the stated amount of coverage in the policy is the value of that property when it is wholly destroyed, the statute does not control here because the property was not completely destroyed. *See Henry v. American Concept Ins. Co.*, 498 N.W.2d 657, 660 (S.D.1993) (Sabers, J., concurring specially).

[¶ 21.] We are not persuaded, though, that Hansen Housing's "financial interest" in the property is limited to the amount it paid at auction. No evidence was presented that the amount paid for the building and its contents was its true fair market value. In fact, there was evidence that the purchase was a "bargain." It cannot be assumed that the price paid was its fair market value, or that the property cannot be sold for more than what was paid for it. An insured's financial interest is the fair market value of the property. *See Zochert v. Nat'l Farmers Union Property & Cas. Co.*, 1998 SD 34, ¶ 11, 576 N.W.2d 531, 534 (defining fair market value) (quoting *Lampe Market Co. v. Alliance Ins. Co.*, 71 S.D. 120, 22 N.W.2d 427, 428 (1946)). Hansen Housing may recover its proven losses as measured against the fair market value of the property.

### 3. Post Incident Losses

[¶ 22.] Auto–Owners contends the trial court erred in finding that Hansen Housing was not precluded from recovery under the policy for failure to maintain heat in the building. The relevant portion of the policy provides that Auto–Owners will not pay losses resulting from frozen plumbing unless the insured (1) does its "best to maintain heat in the building"; or (2) "drain[s] the equipment and shut[s] off the water supply if the heat is not maintained."

[¶ 23.] The trial court found that (1) Hansen Housing "kept all of the electric heat operating in the hospital and kept the pumps constantly circulating the water in the boiler system"; (2) "Larry Braun, Fire Chief of the Ipswich Volunteer Fire Department, testified that upon entering the building on the evening of the loss, the temperature inside the hospital felt 'warm' and well above freezing"; (3) Hansen's sister testified that she "went through the building a couple of days prior to the loss and the inside temperature was very comfortable"; and (4) "Mike Hansen was in the hospital one or two weeks prior to the loss and found the temperature between forty-five and fifty degrees inside." Accordingly, the trial court found that Hansen Housing used its "best efforts to maintain heat in the hospital prior to the loss . . . ."

[¶ 24.] No definition is given in the policy for the phrase "best efforts." We must look elsewhere to define this term. In *Kahler, Inc. v. Weiss*, 539 N.W.2d 86, 91 (S.D.1995), we equated "best efforts" with

"diligent efforts" in the context of the effort required of a broker to sell property. Hansen Housing did its "best" if its actions were reasonable under the circumstances. It was not required to take extraordinary measures. *See id.;* Farnsworth, *supra,* § 2.13, at 78 & n.12 (likening the requirement to use "best efforts" with a duty to use "reasonable efforts").

[¶ 25.] Evidence was presented that Hansen Housing used electric heat to maintain the temperature in the building at between 45 and 50 degrees, and kept the boiler pumps circulating the water in the system. The loss occurred in early November, before temperatures typically become extremely cold. Both Mike Hansen and his sister had been in the building shortly before the loss and had found the temperature sufficient to prevent freezing. In light of this evidence, we cannot say that the court was clearly erroneous in finding that Hansen Housing applied its best efforts to maintain heat in the building.

### 4. Damage Caused by Acts of Others

[¶ 26.] Auto–Owners next argues that it is not obligated to pay for additional damage caused to the building as a result of the power supply being cut off by Montana–Dakota Utilities (MDU) on the evening of November 4, 1991. Auto–Owners points to the following policy language:

3. We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause of Loss results, we will pay for that resulting loss or damage. * * *

i. **Acts or Decisions:** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

[¶ 27.] The trial court determined that this policy exclusion did not impair Hansen Housing's claim. If the language in this clause were to be taken literally, it would exclude from coverage any damage that results from acts or decisions "of all persons, groups, or entities." *Jussim v. Massachusetts Bay Ins. Co.,* 33 Mass.App.Ct. 235, 597 N.E.2d 1379, 1382 (1992). Auto–Owners would have us deny recovery for any damage due to "acts or decisions" which result in loss, if caused by an entity such as MDU in response to an emergency. By this reading, would water damage from fire hoses be excluded if the emergency response had been to a fire?

[¶ 28.] We interpret ambiguities in this exclusion in a light most favorable to the insured. *Chord,* 1999 SD 1, ¶ 14, 587 N.W.2d at 732. Auto–Owners has the burden of proving that the exclusion applies to this situation. *Purdy,* 483 N.W.2d at 199. Whatever margins this clause was meant to encompass, we do not believe it can be interpreted to bar recovery in this situation. The action taken by MDU in turning off the electrical supply to the building was done to prevent injury to emergency personnel, as well as further, more serious, damage to the building. The proximate cause of the loss remained the broken water pipes. *See* Keeton & Widiss, *supra* § 5.5(c), at 553–56 (discussing multiple causes and coverage limitations). The act by MDU of turning off the electrical supply did not bar Hansen Housing's claim.

### 5. Timely Submittal of Proof of Loss

[¶ 29.] Auto–Owners next argues that Hansen Housing failed to submit sworn proof of loss forms for damage to the building within sixty days after request by Auto–Owners, as provided in the policy. Auto–Owners contends that there was neither compliance with, nor a waiver of, this provision. The trial court held that Auto–Owners waived the requirement by its conduct.

[¶ 30.] We do not agree with the trial court that Auto–Owners waived the sixty-day requirement. "Waiver is a volitional relinquishment, by act or word, of a known, existing right conferred in law or contract." *Harms v. Northland Ford Dealers,* 1999 SD 143, ¶ 17, 602 N.W.2d 58,

62 (citation omitted). *See Norwest Bank South Dakota v. Venners*, 440 N.W.2d 774, 775 (S.D.1989) ("To support the defense of waiver, there must be a showing of a clear, unequivocal and decisive act or acts showing an intention to relinquish the existing right."). Nonetheless, we conclude that Hansen Housing's failure to strictly comply with the policy provision will not bar recovery.

[¶ 31.] Hansen Housing returned requested sworn proof of loss forms to Auto–Owners on April 19, 1993, within sixty days of their request. Auto–Owners rejected these forms because they contained "deficiencies," and required that new forms be completed. This second set of forms was not returned until April of 1994. However, Auto–Owners and Hansen Housing were negotiating a settlement in November and December of 1992. As Justice Sabers recognized in *City of Ft. Pierre v. United Fire and Casualty Co.*, 463 N.W.2d 845 (S.D.1990):

> The modern view of notice requirements focuses on the purpose for the requirement and realizes that it is not to provide a technical escape hatch to allow the insurance company to deny coverage. The modern view does not belittle the need for notice to the insurer, but instead puts the notice requirement in its proper perspective. "The clear purpose of the notice provision is to protect the ability of the insurer to prepare a viable defense by preserving its ability fully to investigate the accident." [*Great American Ins. Co. v. C.G. Tate Constr. Co.*, 303 N.C. 387, 279 S.E.2d 769, 775 (1981) ]. In other words, notice requirements are included in insurance contracts to protect the insurance company's interest from being prejudiced. If delayed notification has not prejudiced the insurer's ability to defend a claim, then there is no reason to strictly enforce the notice requirement. As the

court explained in [*Brakeman v. Potomac Ins. Co.*, 472 Pa. 66, 371 A.2d 193, 197 (1977) ]:

> Where the insurance company's interests have not been harmed by a late notice, even in the absence of extenuating circumstances to excuse the tardiness, the reason behind the notice condition in the policy is lacking, and it follows neither logic nor fairness to relieve the insurance company of its obligation under the policy in such a situation.

*City of Ft. Pierre*, 463 N.W.2d at 851–52 (Sabers, J., dissenting). Auto–Owners was not prejudiced by the delay in return of the proof of loss form. During the course of negotiations Auto–Owners undoubtedly became familiar with the losses Hansen Housing experienced. The purpose of the notification clause was fulfilled.

### 6. Intentional Misrepresentation of Loss

[¶ 32.] Auto–Owners argues that Hansen Housing's proof of loss for repairs and replacement of water lines, asbestos removal, water storage tanks, compliance with code requirements, repairing air-handling units, and repairing the heating system were overstated. One contractor testified at trial that he felt Hansen was pushing him to submit a bid based on the cost for replacing the entire heating system, rather than for its repair.[3] The contractor also agreed with the statement by the adjuster that Hansen was "trying to get [the contractor] to give him an inflated estimate." When the contractor would not give Hansen a "locked-in" price on a replacement heating system, another contractor was found.

[¶ 33.] Auto–Owners also asserts that Hansen Housing claimed property losses for a number of items that are not personal property used in the insured's trade or

---

**3.** The contractor testified that Hansen showed him a portion of the insurance policy which "was supposed to have read 100 percent re- placement cost and his definition of replace- ment cost was replacing the entire system."

business. The policy states that covered property consists of:

Business Personal Property located in or on the buildings at the described premises or in the open (or in a vehicle) within 100 feet of the described premises, including:

(1) property you own that is used in your business[.]

Hansen Housing submitted a claim for damaged hospital equipment such as a super nebulizer pump and a fetal monitor. Hansen testified that he had not used the items in his business and did not know what many of them were.

[¶ 34.] Evidence was also provided, however, illustrating that the difference between the insured's and the insurer's estimates for the repair of the building may have been the result of legitimate divergence in opinion between contractors and others. There was further testimony which tended to show that there was some honest confusion over what personal property was in the building at the time of the theft loss, and who the owner of that property was.

[¶ 35.] In its findings, the trial court concluded that there was no "intentional misrepresentations that were made by the insureds or material misrepresentations of fact." The trial judge continued, stating: "Obviously, there were some statements that turned out to be not true, but I don't think that they're of the fraud variety."

[¶ 36.] Auto–Owners had the burden to show, by clear and convincing evidence, that Hansen Housing's loss claims were fraudulent. *Flockhart v. Wyant*, 467 N.W.2d 473, 477 (S.D.1991) (explaining that one typical use of the standard is in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing). In *Alderman v. New York Underwriters' Insurance Co.*, 61 S.D. 284, 248 N.W. 261 (1933), we ruled that to find fraud or false swearing on the part of the insured, there must be "[a]n intent ... and the general rule seems to be that the

statement must be a willfully false one concerning some material matter, and made with the intent to deceive the insurer, in order to work a forfeiture." *Id.* at 267. Exaggerated claims for the purpose of gaining an advantage in settlement negotiations are considered attempts to defraud, even if insureds do not expect to ultimately obtain more than their actual loss. *Lykos v. American Home Ins. Co.*, 609 F.2d 314, 316 (7thCir.1979) (the penalty is "one way of stopping the presentation of false, fictitious or inflated claims.") *cert. denied*, 444 U.S. 1079, 100 S.Ct. 1030, 62 L.Ed.2d 762 (1980) (citing *Tenore v. American & Foreign Ins. Co.*, 256 F.2d 791, 794 (7thCir.), *cert. denied*, 358 U.S. 880, 79 S.Ct. 119, 3 L.Ed.2d 110 (1958)). "There may, however, be an honest misstatement of some fact, and while, as a general rule, fraud and false swearing will avoid the policy, mere mistakes in stating facts which do not in themselves annul its conditions and do not appear to be wilful misrepresentations will not defeat the action." *Alderman*, 248 N.W. at 267 (citation omitted).

[¶ 37.] We review the trial court's findings of fact under the clearly erroneous standard. *Muhlenkort*, 530 N.W.2d at 660. Findings cannot be disturbed unless we are "firmly and definitely convinced a mistake has been made." *Wood*, 1999 SD 8, ¶ 9, 588 N.W.2d at 229 (citation omitted). In deference to the court's findings, Hansen Housing's representations can be viewed as innocuous misstatements. *See Lykos*, 609 F.2d at 315. We cannot say that the trial court was clearly erroneous.

### 7. Timely Notice

[¶ 38.] Auto–Owners next contends that the theft claim should be barred because Hansen Housing failed to give prompt notice of the loss and a description of the property involved, as required by the policy. The trial court decided that although Hansen Housing submitted its theft claim two years after the items were allegedly stolen, the matter "is a fact [for

the jury] to consider but a fact that won't bar it per se." As this question requires the interpretation of a clause in the insurance policy, we review the issue de novo. *National Farmers*, 534 N.W.2d at 64; *Vostad*, 520 N.W.2d at 275.

> Prompt notice to the insurer maximizes an insurer's opportunity to acquire information about the circumstances of a loss (usually by way of a timely investigation when witnesses are most likely to be available and while their memories of the events are generally the most accurate, as well as when there is usually the best opportunity to examine, record, or preserve any physical evidence), which may be important both (1) to the insurer's determinations in regard to whether a loss is covered and (2) to the preparation of a defense to claims by a third party against an insured who is covered by a liability insurance policy.

Keeton & Widiss, *supra* § 7.2(b)(1), at 753 (footnote omitted).

[¶ 39.] Generally, policy provisions that require "prompt notice" mean that the insurer is to be given notice "as soon as practicable in the particular situation." *Id.* § 7.2(b)(2), at 755 (citing *Liberty Mut. Ins. Co. v. Bob Roberts and Co., Inc.*, 357 So.2d 968 (Ala.1978); *RTE Corp. v. Maryland Cas. Co.*, 74 Wis.2d 614, 247 N.W.2d 171 (1976); *Lumbermens Mut. Cas. v. Oliver*, 115 N.H. 141, 335 A.2d 666 (1975)). Thus, we must evaluate whether the notice given was reasonable under the circumstances.

[¶ 40.] Mike Hansen reported to the Edmunds County Sheriff on November 21, 1991 that two television sets, a hand-held snow blower, and some tools were missing from the hospital building. On December 9, 1991, Hansen told the insurance adjuster that he would not be filing a theft claim and Auto–Owners would not have to worry about it because the amount of loss was approximately $750, less than the $1,000 deductible on the policy. Nonetheless, Hansen Housing provided a list of missing items to Auto–Owners on February 22, 1993. This consisted of thirty-two items allegedly stolen, having a combined value of $14,756. A sworn statement in proof of loss was not provided until April 21, 1993.

[¶ 41.] Unlike the claim for the damage to the building, there were no ongoing negotiations or discussions concerning the missing personal property. Auto–Owners did not have reason to know of the extent of the theft claim nor of the items that were allegedly missing. Beyond the initial notification of the missing televisions, snow blower, and tools, Auto–Owners had no reason to believe there was a loss to be investigated. This delay of nearly one and one-half years prejudiced the company's ability to acquire accurate information concerning the claim. We have previously found that no coverage exists when prompt notice of a claim was not provided to the insurer. *Wolff v. Royal Ins. Co. of America*, 472 N.W.2d 233, 236–37 (S.D.1991) (oral notice given was insufficient to satisfy the notice provision in policy). We find here that the notice given by Hansen Housing was not "prompt," prejudiced the company, and thus barred recovery for those items for which notice was not given until February of 1993. The circuit court erred in concluding otherwise.

### 8. Failure to Prevent Loss

[¶ 42.] Finally, Auto–Owners contends that Hansen Housing should not be allowed to recover for damages to the building resulting after the initial loss because of failure to take reasonable steps to prevent further damage. The policy states that the insured must "[t]ake all reasonable steps to protect the Covered Property from further damage by a Covered Cause of Loss." The trial court viewed this as a damage issue for the jury to determine in the separate damages phase of the case.

[¶ 43.] Did the trial court correctly determine this was a damages question rather than a condition barring recovery? Construing the language of the policy most favorably to the insured, we con-

clude that the provision bears on the amount of recovery. In the policy, this provision is under the heading "Property Loss Conditions" and under the sub-heading "Duties in the Event of Loss or Damage." Ten such "duties" are listed. While a number of these "duties" are more properly classified as conditions, for example giving the insurer "complete inventories of the damaged and undamaged property," and permitting the insurer "to inspect the property and records proving the loss or damage," others are more in the nature of duties bearing on the amount of recovery; for example, "[r]esume all or part of your 'operations' as quickly as possible." Requiring the insured to "[t]ake all reasonable steps to protect the Covered Property from further damage," we believe, falls more properly into the latter category. Therefore, the trial court correctly determined that this provision did not bar Hansen Housing's recovery, and instead related to the amount of recovery and was for the jury to determine.

[¶ 44.] Affirmed in part and reversed in part.

[¶ 45.] MILLER, Chief Justice, and SABERS, AMUNDSON, and GILBERTSON, Justices, concur.