#25507-a-JKK
**2010 S.D. 93**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

WESTERN NATIONAL MUTUAL
INSURANCE COMPANY,                                    Plaintiff and Appellee,

v.

VALERIE DECKER, as Guardian
Ad Litem of L.E.D., a minor,                           Defendant and Appellant,

and

SARAH DECKER, formerly SARAH
WALDNER; and BENJAMIN WALDNER,          Defendants.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

HONORABLE STUART L. TIEDE
Judge

* * * *

DOUGLAS M. DEIBERT of
Cadwell, Sanford, Deibert &
  Garry LLP                                      Attorneys for plaintiff
Sioux Falls, South Dakota                        and appellee.

STEPHANIE E. POCHOP of
Johnson Pochop Law Office                        Attorneys for defendants
Gregory, South Dakota                            and appellants.

* * * *

CONSIDERED ON BRIEFS
ON OCTOBER 4, 2010

OPINION FILED **12/08/10**

#25507

KONENKAMP, Justice

[¶1.]     A parent whose child was injured while in the care of a babysitter brought suit to recover damages. In a declaratory judgment action, the insurance company successfully argued that its policy did not cover injuries sustained in a daycare-type business. We conclude that the circuit court correctly ruled that the policy was unambiguous and the business exclusion applied.

## Background

[¶2.]     On January 11, 2001, Joe Decker left his eight-month-old child, L.E.D., with Sarah Decker. Sarah placed L.E.D. in his car seat thinking he would go to sleep. Moments later she heard him make an odd noise. She took him out of the car seat; he had stopped breathing; he was choking on a small object. Sarah called for help, but ultimately the child suffered permanent brain damage.

[¶3.]     At the time, Sarah was living with Benjamin Waldner, her brother. Benjamin owned the home. It was insured by Western National Mutual Insurance Company. Benjamin allowed Sarah to live there rent free. She cleaned and cared for the home while Benjamin, a trucker, was gone. Sarah's fiancé, Mark Decker, lived there also, along with others who rented rooms from Benjamin. Mark Decker is Joe Decker's cousin. Benjamin, Sarah, Mark, and Joe all came from the same Hutterite colony.

[¶4.]     Sarah cared for several children in Benjamin's home. She did not have a name for her babysitting service or a written agreement with the parents about when and how she would be paid. In the year 2000, she provided care for nine children from six families. Sarah kept no records and filed no income tax returns.

-1-

She recalled that she charged some parents $1.50 per hour. The hours Sarah cared for the children varied, but she provided care five days a week, generally from nine to five.

[¶5.]     In March 2000, Joe Decker and his wife Valerie began using Sarah to care for their older child, B.D. L.E.D. was born on May 23, 2000. Sarah started caring for him, according to Valerie, in August 2000. Sarah testified that when Joe dropped off and picked up the children, she did not charge him, in honor of the relationship between her fiancé, Mark, and his cousin, Joe. When Valerie picked the boys up, however, Valerie would pay her and Sarah accepted the payments. Valerie did not document these payments, but claimed $1,684 in child care credits on their 2000 federal income tax return for amounts paid to Sarah. It is undisputed that on the day of L.E.D.'s injury, Joe dropped off L.E.D. and Sarah did not charge him for her services.

[¶6.]     A lawsuit on behalf of L.E.D. was brought against Sarah Decker and Benjamin Waldner for negligence. Western National sought a declaratory judgment that it had no duty to defend the action against Sarah or Benjamin or indemnify them because the policy unambiguously excluded coverage for L.E.D.'s injury. Both sides moved for summary judgment.

[¶7.]     Western National argued that when the accident occurred, Sarah was operating a business, and the injury was sustained as a result of her business activities, which were not covered under the express terms of the policy. Valerie, on the other hand, asserted that Western National's policy is ambiguous on the facts of

the case, and the ambiguity should be construed against Western National and in favor of coverage.

[¶8.] The policy defines "Business" as "a trade, a profession, or an occupation including farming, all whether full or part time. . . . 'Business' includes services regularly provided by an 'insured' for the care of others and for which an 'insured' is compensated. A mutual exchange of like services is not considered compensation." The policy further states that "'[b]usiness' does not include: . . . b. activities that are related to 'business,' but are usually not viewed as 'business' in nature." Under the section entitled "EXCLUSIONS THAT APPLY TO LIABILITY COVERAGES," the policy provides, "'We' do not pay for 'bodily injury' or 'property damage' resulting from one or more of the following excluded 'occurrences,' . . . g. 'bodily injury' or 'property damage' resulting from activities related to the 'business' of an 'insured,' except as provided by Incidental Business Coverage." No incidental business coverage existed in this case.

[¶9.] Finding the policy language unambiguous, the circuit court ruled that Sarah regularly provided care for others for which she was compensated. In the court's view, it was immaterial that Sarah did not charge Joe and Valerie Decker each time she cared for their children: she cared for children on a daily basis and was "compensated" as part of her business pursuit. The court ruled inapplicable the exception to the exclusion, which provided that "business" does not include "activities that are related to 'business,' but are usually not viewed as 'business' in nature." In the court's view, L.E.D. was injured as a result of the care provided through Sarah's operation of her business. Because Sarah was operating a business

as defined under the policy, and the policy does not cover bodily injury caused by the operation of a business, the court granted summary judgment for Western National.

## Analysis and Decision

[¶10.] On appeal, Valerie argues that Western National's insurance policy is ambiguous because the policy defines business to include certain activities while it excludes "activities related to 'business' but are not usually viewed as 'business' in nature[.]" Insurance contract interpretation is a question of law reviewed de novo. *Auto-Owners Ins. Co. v. Hansen Hous., Inc.,* 2000 S.D. 13, ¶ 10, 604 N.W.2d 504, 509 (citations omitted). According to Valerie, without any parameters or guidelines on what activities Western National considers related to business but not usually viewed as business in nature, the policy provisions are "open to multiple interpretations" and are, therefore, ambiguous.[*]

[¶11.] "Ambiguity in an insurance policy is determined with reference to the policy as a whole and the plain meaning and effect of its words." *Nat'l Sun Indust., Inc. v. S.D. Farm Bureau Ins. Co.,* 1999 S.D. 63, ¶ 18, 596 N.W.2d 45, 48 (citation omitted). In construing the provisions of an insurance contract, we do not seek strained interpretations. *Id.* Moreover, "[t]he terms of an unambiguous insurance

---

[*] Both parties cite to and quote language from other courts analyzing when daycare-type services constitute a business under various insurance policies from other companies. In some of those cases, the insurance policies did not define business to include compensation. Rather, the courts were asked to interpret the phrase "business pursuit," and in so interpreting discussed compensation and profit motive. Here, however, business is defined in the policy. Therefore, we will restrict our analysis of the facts to the definitions given under the policy.

policy cannot be enlarged or diminished by judicial construction." *Am. Family Mut. Ins. v. Elliot*, 523 N.W.2d 100, 102 (S.D. 1994) (citation omitted).

[¶12.] There are three policy provisions we must examine here. First, the policy defines business to include "services regularly provided by an 'insured' for the care of others and for which an 'insured' is compensated." There is no dispute Sarah is an insured. Therefore, if Sarah regularly provided care to others and was compensated for such care, her activities satisfy the policy definition of a business. The fact that the policy does not define "regularly" or "compensated" does not make the policy ambiguous. "Ambiguity in an insurance policy is determined with reference to the policy as a whole and the plain meaning and effect of its words." *Nat'l Sun Indust., Inc.*, 1999 S.D. 63, ¶ 18, 596 N.W.2d at 48 (citation omitted).

[¶13.] Valerie asserts that there is a material issue of fact in dispute on whether Sarah's care was regularly provided because Sarah had no set schedule — she cared for children on a "those who came, came" basis. That Sarah did not have a concrete schedule does not create a material issue of fact on whether her care of others was "regularly" provided. From the undisputed evidence that Sarah provided care, even on an unscheduled basis, Sarah's care of others was regular in nature. She cared for children in Benjamin's home five days a week for over a year, and during that time L.E.D. was injured. Her care of others did not involve isolated acts, but was in fulfillment of a continuous, regular arrangement with the various parents. Sarah was L.E.D.'s regular caregiver, a point Valerie does not dispute.

[¶14.] Valerie next argues that because Sarah did not receive compensation on the day of the accident, and on the days when Joe dropped off and picked up the

children, Sarah was not "compensated" as required in the policy's definition of a business. In construing the term "compensated," Valerie concentrates, not on the fact that Sarah was paid for some of the care she provided, but instead on the fact that Sarah did not charge Joe Decker because of the relationship between Joe and Sarah's fiancé, Mark.

[¶15.]	Whether Sarah was compensated for purposes of this insurance policy depends on whether, under the policy language, Sarah's activities with L.E.D. can be isolated to the day L.E.D. was injured, or whether Sarah's regular and continuous child care must be examined in a more general sense. True, on the day L.E.D. was injured, Sarah received no compensation for her care of L.E.D. Yet, to disregard the fact that Sarah was paid in direct relation to her providing child care on a regular basis would require us to narrowly define the word "compensated" beyond its plain meaning and effect. There is no dispute that Valerie paid Sarah $1,684 to care for her children in 2000. There is also no dispute that in regularly providing care for others Sarah was compensated by the parents. Sometimes she charged parents $1.50 per hour, per child, and other times less, if more than one child in a family was cared for. Under a reasonable interpretation of the policy definition of "business," Sarah was regularly providing care for others for which she was compensated.

[¶16.]	We must next construe a second policy provision. Valerie argues that even if Sarah's child care services can, in a broad sense, be regarded as a business under the policy, the policy provides in its definition of business that business does not include "activities that are related to 'business' but are not usually viewed as

'business' in nature." Because Sarah did not charge Joe for L.E.D.'s care on January 11, 2001, and free child care as a favor to a family member or friend is not usually viewed as business in nature, Valerie contends that the exception to the exclusion applies.

[¶17.]      While babysitting on a single occasion for a family member or friend, or even occasionally, with or without compensation, might not ordinarily be viewed as business in nature, on January 11, 2001, Joe dropped L.E.D. off to be cared for by Sarah as part of a continuing arrangement. The care that day was beyond a casual accommodation for Joe or Valerie's sake and was not an isolated or episodic favor to a friend or family member. Sarah's care for L.E.D. that day was related to her business of providing child care and must be viewed as business in nature.

[¶18.]      Valerie offers multiple scenarios for when the activity of caring for another would not be viewed as business in nature. These scenarios, however, are not the facts of this case. And simply because child care can be viewed as business in nature in one instance and not in another does not make the insurance policy ambiguous. Under these facts, the policy is not "capable of more than one meaning when viewed objectively[.]" *See Ziegler Furniture and Funeral Home, Inc. v. Cicmanec*, 2006 S.D. 6, ¶ 16, 709 N.W.2d 350, 355 (citation omitted). With reference to the entire policy, the "plain meaning and effect of the words" in the policy are clear. *See Econ. Aero Club, Inc. v. Avemco Ins. Co.*, 540 N.W.2d 644, 645 (S.D. 1995) (citation omitted). Sarah was caring for L.E.D. as part of her business activity.

[¶19.] The third policy provision we must construe is: "A mutual exchange of like services is not considered compensation." Valerie argues that Sarah provided care for free in exchange for the relationship between Joe and Mark and as part of what was expected of her having been raised on a Hutterite colony. But there are no facts to support the notion that Joe or Valerie exchanged any service equivalent to what Sarah provided in caring for Joe and Valerie's children. The mutual-exchange-of-like-services clause does not apply here.

[¶20.] Finally, Valerie argues that because her complaint asserts a claim against Benjamin for negligent supervision — and he was not compensated and did not provide regular care of others — the business exclusion clause is not implicated against him. The insurance policy does not pay for bodily injury "resulting from activities related to the 'business' of an 'insured'" "regardless of other causes or 'occurrences' that contribute to or aggravate the 'bodily injury[.]'" Even assuming that Benjamin was somehow negligent or contributed to L.E.D.'s injury, the fact that L.E.D.'s injury resulted from Sarah's business activities precludes coverage.

[¶21.] Affirmed.

[¶22.] GILBERTSON, Chief Justice, and ZINTER, MEIERHENRY, and SEVERSON, Justices, concur.